UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROBERT DAVID BROWN,

Plaintiff,

                                            Case No. 1:19-cv-00636-TPK

     v.

COMMISSIONER OF SOCIAL               OPINION AND ORDER
SECURITY,

Defendant.

## OPINION AND ORDER

Plaintiff Robert David Brown filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security. That final decision, issued by the Appeals Council on March 17, 2019, denied an application for supplemental security income filed on Mr. Brown's behalf while he was a minor child. Mr. Brown has now moved for judgment on the pleadings (Doc. 9) and the Commissioner has filed a similar motion (Doc. 15). For the following reasons, the Court will the Court will **DENY** Plaintiff's motion, **GRANT** Defendant's motion, and direct the Clerk to enter judgment in favor of the Defendant Commissioner.

## I. BACKGROUND

Plaintiff's application was filed by his mother, acting on his behalf, on September 16 , 2015. At the time, he was a child under the age of 18. The application alleged that he became disabled on June 4, 2014. After initial administrative denials of his claim, Plaintiff appeared and testified at a video administrative hearing held on June 29, 2018. His mother, Karen Lynn Brown, also testified.

The Administrative Law Judge issued an unfavorable decision on August 29, 2018. He first found that Plaintiff had not worked since the date his application was filed. Next, the ALJ concluded that Plaintiff suffered from severe impairments including ADHD and depression. Moving forward with the sequential evaluation process, the ALJ then found that neither of Plaintiff's impairments met the criteria for disability under various sections of the Listing of Impairments. Next, the ALJ evaluated Plaintiff's impairments under the six areas (or domains of functioning) applicable to a child's application for benefits, which include acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for oneself, and health and physical well-being.

After reviewing the evidence presented, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that resulted in either marked limitations in two domains of functioning or an extreme limitation in one domain of functioning.  Because a finding of two marked limitations or one extreme limitation is necessary in order to grant a child's application for benefits, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in his motion for judgment on the pleadings, raises two claims of error.  First, he argues that the ALJ erred by relying on stale evidence.  Second, he asserts that the ALJ's findings as to three of the six domains - acquiring and using information, interacting and relating to others, and caring for self - are not supported by substantial evidence.

## II.  THE KEY EVIDENCE

The Court begins its review of the evidence by summarizing the testimony given at the administrative hearing.

Plaintiff was 17 when the hearing was held.  He stopped going to school in the tenth grade, and at that time was serving an in-school suspension for making threats.  He had an IEP which permitted him to take extra time on schoolwork and leave the classroom if he needed some peace and quiet.  He lived in an apartment with his mother.

In his spare time, Plaintiff said, he listened to music.  He did not really perform any household chores although his mother asked him to do so.  He had friends online.  When asked why he had trouble in school, Plaintiff said that he was easily distracted.  He also explained that his suspension grew out of a break-up with his girlfriend and that he threatened the school out of jealousy.

At the time of the hearing, Plaintiff was taking two types of medication.  He said they made him tired and increased his appetite.  He did discontinue his medication for a time, but when he did so he experienced more depression and more suicidal thoughts as well as more difficulty focusing.

In response to additional questions from his attorney, Plaintiff said that he was able to finish his homework assignments during the school day.  He was also attending counseling on a monthly basis.  He had tried to harm himself in the past but not for some time.

Plaintiff's mother testified that she mostly agreed with what Plaintiff said at the hearing.  She also said he had trouble sleeping and that he went into a downward spiral when he was off his medications.  She explained that he seldom left his room or the house and did not socialize with others his own age.  He was also prone to outbursts of anger, but he had good days as well.  She thought his biggest problem in school was being in a classroom filled with other students and that he did better in smaller classes.  She thought he was seeing a counselor every other week and

said he was able to get to appointments on his own.  He had poor hygiene and it was hard for him to get up and get going in the morning.  These problems all began in the fifth or sixth grade.  Currently, he had poor reading skills, something which dated back to his time in grade school, and she did not think he could care for himself independently when he became an adult.

Plaintiff's claims of error focus on three of the six applicable domains of functioning - acquiring and using information, interacting and relating to others, and caring for self.  The Court's review of the evidence will largely center around those three matters.

The record contains a teacher questionnaire completed by a middle school teacher who taught Plaintiff English and also was his resource room teacher.  Plaintiff was in eighth grade at the time but was reading at a third grade level.  His math skills were the same.  She evaluated his ability to acquire and use information in various areas, noting that his most serious problem was expressing his ideas in written form but that he also had a serious problem comprehending and doing math problems.  All of his other problems in this area were described as "slight."  He also had several obvious problems in the area of attending and completing tasks and was easily distracted.  He did not have any obvious problems relating to others, however, or in caring for himself.  (Tr. 207-14).  His IEP for that year allowed him to be in the resource room, to have speech therapy, and to use consultant teacher services in the classroom.  It appears that he did repeat the seventh grade.  His IQ scores at that time were in the average to low average range, and his math and reading achievement test scores ranged from low average to high average.  Other testing done in early 2015 produced scores which were mostly "above to within normal limits for a child his chronological age," (Tr. 233), and his cognitive abilities were rated as "within the low average to average range" although he worked at a slow pace and needed a significant amount of response time.  (Tr. 247).

Plaintiff's tenth grade IEP is also part of the record.  That document shows that his attention to schoolwork had increased and he had shown "considerable improvement in his academics."  At that time, he was reading at a fourth to fifth-grade level.  The report indicates that his poor performance in some classes was likely due to a choice not to achieve rather than any true difficulty understanding the material.  He did experience challenges in the areas of organization, planning, and initiation.  His social and physical development were normal.  He was given the use of the resource room program and of a consultant teacher as well as receiving seating away from other students and distractions.  (Tr. 248-57).

A mental health assessment done in 2015 showed that Plaintiff related well to his mother but had a volatile relationship with his nine-year-old sister.  He had been hospitalized for several weeks that year to treat his depression with suicidal ideation.  Plaintiff demonstrated deficits in interpersonal relationships, optimism, and education and was failing several classes.  He had been referred to Spectrum Mental Health for counseling after his discharge from the hospital.  He was seeing a different provider (Gateway Longview) in 2017 and carried a primary diagnosis of ADHD, but also reported anger management issues.  He did not want to be in therapy at that time and denied any current issues with depression.  The course of his treatment showed that he did

-3-

make progress identifying things that triggered his anger but that he also had gone off his medications and reported increased social isolation.

Plaintiff's impairments were evaluated by a state agency consultant, Dr. Dambrocia, on December 3, 2015.  According to that evaluation, in the six pertinent domains Plaintiff had a "less than marked" impairment in three areas (acquiring and using information, attending and completing tasks, and caring for oneself), a marked limitation in a fourth (interacting and relating to others), and no limitation in two (moving about and manipulation of objects and health and physical well-being).  (Tr. 66-73).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

### IV.  DISCUSSION

This Court has explained, in past decisions, the regulatory framework under which a child's disability claim is judged.  As stated in *Will o/b/o C.M.K. v. Comm'r of Soc. Sec.*, 366 F.

-4-

Supp. 3d 419, 422–23 (W.D.N.Y. 2019),

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). An ALJ follows a three-step sequential evaluation to determine whether a child is entitled to SSI benefits. *Encarnacion ex rel. George v. Astrue*, 568 F.3d 72, 75 (2d Cir. 2009). "First, the child must not be engaged in 'substantial gainful activity.' Second, the child 'must have a medically determinable impairment(s)' that is 'severe' in that it causes 'more than minimal functional limitations.' Third, the child's impairment or combination of impairments must medically or functionally equal an impairment listed in an appendix to the regulations." *Id*. (quoting 20 C.F.R. § 416.924).

The limitations caused by a child's severe impairment are evaluated pursuant to six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself, and (6) health and physical well-being. See 20 C.F.R. § 416.926a(b)(1). "For a child's impairment to functionally equal a listed impairment, the impairment must 'result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.' " *Encarnacion*, 568 F.3d at 75 (quoting 20 C.F.R. § 416.926a(a) ). "A marked limitation is more than moderate but less than extreme and interferes seriously with a child's ability to independently initiate, sustain, or complete activities. An extreme limitation is more than marked and interferes very seriously with a child's ability to independently initiate, sustain, or complete activities." *Id*. (internal quotations and citations omitted).

The question in this case is whether the ALJ's decision that Plaintiff did not qualify for benefits under this regulatory scheme is supported by substantial evidence.

## A.  Stale Evidence

Because the ALJ's reasoning process and the evidence on which he relied are the focus of both of Plaintiff's arguments, the Court will first summarize the key aspects of the ALJ's decision.

The ALJ engaged in a lengthy and accurate summary of all of the medical and educational records, noting that over time (2015 to 2018) there were many indications of improvement in Plaintiff's schoolwork and also progress in the treatment of his depression and anger, to the point where, in 2017, he was not showing any significant symptoms of either.  At

that point, Plaintiff also reported improvement in his sleep and no longer had bouts of sadness, although when off his medications he still struggled at school.  The ALJ pointed out that the last set of records from 2018 also showed "significant improvement in [Plaintiff's] symptoms."  (Tr. 20).

The ALJ then began his analysis of the opinion evidence.  The first opinion discussed in detail was from the eighth-grade evaluation done in 2015.  That evaluation, according to the ALJ, supported the conclusion that Plaintiff's primary limitations were in the areas of acquiring and using information, attending and completing tasks, and interacting and relating to others.  He then assigned great weight to the state agency consultant's opinion (which is the only medical opinion in the record) based on that consultant's "knowledge of the disability program" and the fact that the opinion was consistent with the record.  (Tr. 20-21).  The records the ALJ specifically cited in support of that statement included the subsequent treatment notes from Gateway Longview and from the treating psychiatrist, Dr. Chopra.  (Tr. 21).  The balance of the ALJ's decision consists of a detailed explanation about why, in each of the six domains of functioning, the ALJ reached the same conclusions as did Dr. Dambrocia, the state agency consultant, and it included references to the 2017 IEP and mental health treatment notes.

Plaintiff's first argument is that the evaluations on which the ALJ relied dated from 2015 and were thus outdated by the time he made his decision.  According to Plaintiff, those evaluations failed to take into account the subsequent treatment Plaintiff received from Gateway Longview and observations in those treatment notes concerning to his ability to control his anger and impulses.  Plaintiff asserts that this information is pertinent both to the domain of relating to others and of self-care.  Plaintiff also notes that the 2015 teacher evaluation was undermined by the fact that Plaintiff was subsequently suspended based on having made threats and ultimately dropped out of school, and was itself unreliable due to the limited nature of the evaluating teacher's interaction with Plaintiff.  In response, the Commissioner argues that the later evidence does not contradict anything in the two evaluations on which the ALJ relied and, in fact, provides additional support for his conclusions.  As part of the argument on both this and the next issue, the Commissioner also observes that the ALJ commented on not just the "stale" evidence but the later teacher and counselor notes and that he appropriately weighed all of the evidence - and not just the most negative comments made in those records - in coming to his conclusions about the extent of Plaintiff's impairments.

Evidence that reflects only an early stage of a claimant's treatment is typically characterized as "stale" (and therefore not properly relied on) not just when it is dated, but when it is inconsistent with later evidence demonstrating that its evaluation of the claimant's condition may be inaccurate in light of more recent developments.  As this Court has said,

> "medical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." *Camille v. Colvin*, 104 F.Supp.3d 329, 343 (W.D.N.Y. 2015). "A medical opinion may be stale if it does not account for the claimant's deteriorating condition."

*Carney v. Berryhill*, No. 16-CV-269-FPG, 2017 WL 2021529, at \*6 (W.D.N.Y. May 12, 2017). However, a medical opinion is not necessarily stale simply based on its age. A more dated opinion may constitute substantial evidence if it is consistent with the record as a whole notwithstanding its age. *See Andrews v. Berryhill*, No. 17-CV-6368 (MAT), 2018 WL 2088064, at \*3 (W.D.N.Y. May 4, 2018) (ALJ did not err in relying on dated opinions where there was no indication the plaintiff's "condition had significantly deteriorated after the issuance of ... [the] opinions such that they were rendered stale or incomplete").

*Biro v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 464, 469–70 (W.D.N.Y. 2018).

Here, the Court cannot accept Plaintiff's contention that the ALJ erred by relying heavily on the two 2015 evaluations. As noted, the ALJ, although he made findings in accordance with the state agency consultant's opinion and the teacher evaluation done in 2015, did not simply disregard the balance of the medical and educational evidence. He both thoroughly summarized it (noting the negative as well as the positive aspects of those records) and then discussed the subsequent evidence in connection with the conclusions he reached about the extent of Plaintiff's impairment in each of the six relevant domains of functioning. Whether the ALJ's conclusion that nothing in that later evidence undermines the reliability of the earlier evidence is a separate issue, and one which is more properly discussed in the context of Plaintiff's second claim of error. What is clear, however, is that the ALJ did not simply rely on the 2015 evaluations without being aware of, or discussing the import of, the subsequent educational and medical evidence in the record.

## B. The ALJ's Evaluation of the Evidence

Plaintiff's second claim is that the ALJ mischaracterized or selectively read the evidence. He argues that the evaluation relied on by the ALJ showed a serious problem in acquiring and using information, which equates to a "marked" limitation under the applicable regulation. He contends that this conclusion was not contradicted, but was actually strengthened by, the later IEP evaluation and by his poor academic performance after that evaluation was made. Plaintiff also asserts that the only fair reading of the record in terms of his ability to relate to others is that his anger and lack of impulse control, including his threats to harm others such as his mother's boyfriend, is that he had a marked impairment in this area. Finally, he criticizes the ALJ for ignoring the fact that he had suicidal thoughts and required inpatient treatment for that, all of which suggest that he had a major problem taking care of himself, a problem compounded by his inability or unwillingness to participate meaningfully in treatment.

Although Plaintiff has accused the ALJ of "cherry-picking" the evidence, his decision makes clear that he did not do so. Rather, as noted above, the ALJ discussed aspects of the record which arguably supported a greater degree of impairment but concluded that, on balance, the evidence did not mandate the conclusion that Plaintiff had more than one marked impairment. It is possible, of course, that a different adjudicator might have come to a different

-7-

conclusion, but that is not the issue.  As this Court recently said in *Stover v. Saul*, 2020 WL 897411, *2 (W.D.N.Y. Feb. 25, 2020), "'[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.' *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that '[g]enuine conflicts in the medical evidence are for the Commissioner to resolve.' *Veino* [*v. Barnhart*], 312 F.3d [578 (2d Cir. 2002)] at 588."

Here, the record supports the ALJ's conclusions as to Plaintiff's level of impairment. Although the 2015 teacher evaluation does highlight some serious issues in acquiring and using information, that comment was not, as the Commissioner points out, made applicable to every aspect of acquiring and using information, but was limited to a few discrete areas.  In other words, the ALJ was permitted to interpret that report as demonstrating a less than marked impairment in that area.  Further, the teacher who completed the evaluation form had the opportunity to observe Plaintiff both in English class and also in the resource room, making her a fairly reliable reporter.  The ALJ acted within his discretion in giving significant weight to that evaluation.

It also cannot be doubted that at times Plaintiff had difficulty relating to others, particularly due to his anger issues, and that he was at risk for self-harm at various points.  On the other hand, the treatment notes from 2017 and 2018 (as well as from 2015) show improvement in Plaintiff's ability to manage his symptoms and the positive effects of medication and counseling. At one point, it was determined that he did not need further counseling, and he often reported feeling happy and having normal interactions with others.  A reasonable person reviewing this record could have concluded, as the ALJ did, that neither his depression nor his anger management issues rose to the level of "extreme" and that they rose to the "marked" level only in the area of relating to others.  Since that conclusion leads to the determination that Plaintiff did not qualify for disability under the child disability rules (that is, to qualify for benefits, a claimant must have either one extreme or two marked areas of impairment), the Court must affirm the ALJ and overrule Plaintiff's motion for judgment.

## V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **DENIES** Plaintiff's motion (Doc. 9), **GRANTS** Defendant's motion (Doc. 15), and directs the Clerk to enter judgment in favor of the Defendant Commissioner.

/s/ Terence P. Kemp
**United States Magistrate Judge**

-8-